IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| COLLEGIATE LICENSING COMPANY, LLC<br><br>Plaintiff,<br><br>v.<br><br>THE PARTNERSHIPS and UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE "A,"<br><br>Defendants. | Case No. 24-cv-06219 |

# COMPLAINT

Plaintiff Collegiate Licensing Company, LLC (hereinafter, "CLC" or "Plaintiff"), hereby brings the present action against the Partnerships and Unincorporated Associations identified on Schedule A attached hereto (collectively, the "Defendants") and alleges as follows:

## I. JURISDICTION AND VENUE

1. This Court has original subject matter jurisdiction over the claims in this action pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051, *et seq.*, 28 U.S.C. § 1338(a)-(b), and 28 U.S.C. § 1331.

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may properly exercise personal jurisdiction over Defendants since each of the Defendants directly targets business activities toward consumers in the United States, including Illinois, through at least the fully interactive, e-commerce stores[1] operating under the seller aliases identified in Schedule A attached hereto (collectively, the "Seller Aliases"). Specifically, Defendants have

---

[1] The e-commerce store urls are listed on Schedule A hereto under the Online Marketplaces and Domain Names.

targeted sales to Illinois residents by setting up and operating e-commerce stores that target United States consumers using one or more Seller Aliases, offer shipping to the United States, including Illinois, accept payment in U.S. dollars and/or funds from U.S. bank accounts, and, on information and belief, have sold and continue to sell products using infringing and counterfeit versions of the federally registered trademarks protected and enforced by Plaintiff to residents of Illinois. Each of the Defendants is committing tortious acts in Illinois, is engaging in interstate commerce, and has wrongfully caused Plaintiff substantial injury in the State of Illinois.

## II. INTRODUCTION

3. This action has been filed by Plaintiff to combat e-commerce store operators who trade upon the reputation and goodwill of Plaintiff and the CLC University Clients (as defined herein) by offering for sale and/or selling unauthorized and unlicensed products using infringing and counterfeit versions of one or more trademarks protected and enforced by Plaintiff (the "Counterfeit Products").

4. Defendants create e-commerce stores operating under one or more Seller Aliases that are advertising, offering for sale and selling Counterfeit Products to unknowing consumers. E-commerce stores operating under the Seller Aliases share unique identifiers, establishing a logical relationship between them and demonstrating that Defendants' counterfeiting operation arises out of the same transaction, occurrence, or series of transactions or occurrences. Defendants attempt to avoid and mitigate liability by operating under one or more Seller Aliases to conceal both their identities and the full scope and interworking of their counterfeiting operations. Plaintiff is forced to file this action to combat Defendants' counterfeiting of the trademarks protected and enforced by Plaintiff, as well as to protect unknowing consumers from purchasing Counterfeit Products over the Internet. Plaintiff and the CLC University Clients have

been irreparably harmed and continues to be irreparably damaged through consumer confusion, dilution, and tarnishment of the valuable trademarks as a result of Defendants' actions and seeks injunctive and monetary relief.

### III. THE PARTIES

5. Plaintiff CLC is a Georgia limited liability company having its principal place of business at 1075 Peachtree Street, Suite 3300, Atlanta, Georgia 30309.

6. Plaintiff CLC is a trademark licensing and enforcement agent that represents more than 700 colleges, universities, bowl games, collegiate athletic conferences and other brands, including the University of Alabama, the University of Kansas, and the University of Michigan (collectively, "CLC University Clients") whose trademarks (the "CLC Protected Trademarks" as defined below) are used on Counterfeit Products without authorization and sold by one or more Defendants.

7. A significant aspect of CLC's business has been for many years, and continues to be, the licensing of famous collegiate trademarks including, but not limited to the CLC Protected Trademarks. Indeed, the efforts of CLC together with the enormous popularity of the CLC Protected Trademarks create valuable licensing royalties that support a myriad of programs, operations and other educational and athletic initiatives of CLC University Clients (collectively, "Programs"). CLC, on behalf of CLC University Clients, has entered into numerous trademark licensing agreements in the United States and around the world, authorizing use of famous CLC Protected Trademarks on a wide variety of products, including jerseys, caps, other apparel, and many other products (collectively, "Genuine CLC Products"). Given CLC generates revenues based upon the sale of Genuine CLC Products, CLC is significantly damaged by the sale of Counterfeit Products, which decreases sales of Genuine CLC Products and thus causes

significant financial and irreparable harm to CLC and the CLC University Clients, negatively impacting the ability to support the Programs.

8. CLC University Clients are the owners of many famous and distinctive trademarks and work in conjunction with CLC to license and protect those trademarks. CLC University Clients commercially exploit, protect and enforce rights in the famous and distinctive trademarks, names, logos, symbols, emblems, uniform designs, uniform trade dress colors, and other identifying indicia associated with CLC University Clients, including, but not limited to, those that are the subject of valid and subsisting trademark registrations on the Principal Register of the United States Patent and Trademark Office and those that CLC University Clients have adopted and used in commerce throughout the United States, including in Illinois. CLC University Clients own United States federal trademark registrations for specific marks in a variety of classes and for a variety of different goods and services, including, without limitation, many for apparel such as jerseys, shirts, caps, and other products in international class 25. A non-exclusive list of the famous and distinctive trademarks that CLC University Clients have registered before the United States Patent and Trademark Office, and currently in use in commerce, include the following (collectively, the "CLC Protected Trademarks"):

| UNIVERSITY OF ALABAMA  U.S. Reg. No. 1,483,351 | ALABAMA  U.S. Reg. No. 1,429,820 | CRIMSON TIDE  U.S. Reg. No. 1,338,772 | 𝓐  U.S. Reg. No. 4,640,171 |
|---|---|---|---|

| KU<br><br>U.S. Reg. No. 1,974,554 | KANSAS<br><br>U.S. Reg. No. 2,073,857 | JAYHAWKS<br><br>U.S. Reg. No. 3,443,532; 2,059,529 | U.S. Reg. No. 1,975,744 |
|---|---|---|---|
| MICHIGAN<br><br>U.S. Reg. Nos. 4,764,581; 1,310,132 | WOLVERINES<br><br>U.S. Reg. No. 2,357,021 | M GO BLUE<br><br>U.S. Reg. Nos. 2,781,716; 1,307,632 | U.S. Reg. No. 1,364,137 |

The CLC Protected Trademarks are valid, subsisting, in full force and effect, and many are incontestable pursuant to 15 U.S.C. § 1065. The registrations for the CLC Protected Trademarks constitute *prima facie* evidence of their validity and of CLC's and the CLC University Clients' exclusive rights to use the CLC Protected Trademarks pursuant to 15 U.S.C. § 1057(b). True and correct copies of the Federal Trademark Registrations for the above CLC Protected Trademarks are attached hereto as **Exhibit 1**.

6. As a result of the extensive use of CLC Protected Trademarks in connection with a wide variety of genuine licensed merchandise promoted, sold and/or rendered in the United States and abroad, as well as widespread use in connection with a broad array of educational and athletic initiatives and sponsorship activities spanning diverse industries, such trademarks have for many decades, and long prior to any use made by Defendants, functioned as unique source identifiers in the public mind for CLC University Clients. As a result, CLC Protected Trademarks are famous and possess significant goodwill of great value.

5

7. CLC, through its trademark licensing agency agreements with the CLC University Clients, is authorized to protect and enforce the CLC Protected Trademarks on behalf of the CLC University Clients. To protect CLC Protected Trademarks from infringement, dilution, disparagement, and misappropriation, CLC, in collaboration with CAPS (as defined herein), has established a comprehensive program of trademark protection, including regularly investigating suspicious e-commerce stores identified in proactive Internet sweeps and reported by consumers.

9. The CLC Protected Trademarks are widely known to and enormously popular with both sports fans and the general public. CLC has promoted and advertised the CLC Protected Trademarks extensively for many years. The CLC Protected Trademarks are among the most renowned and immediately recognizable marks in college sports today. As a result of substantial advertising, promotion and media attention, and CLC's extensive licensing for a wide variety of goods and services, the CLC Protected Trademarks have acquired secondary meaning and represent significant goodwill of great value to CLC and the CLC University Clients.

10. Millions of fans have attended sports games and related events, enjoyed television and radio broadcasts of games and related events for the CLC University Clients, and purchased merchandise bearing CLC Protected Trademarks to identify with their favorite CLC University Client team.

11. CLC, directly and through authorized licensees, has established and maintained high standards of quality for Genuine CLC Products (as defined herein), and continues to maintain stringent quality control over licensees and other authorized users of CLC Protected Trademarks.

12. In supervising licensees through its trademark license agreements entered into on behalf of the CLC University Clients, CLC provides licensees and licensed product manufacturers with specifications setting forth extensive details with respect to use of CLC Protected Trademarks, including typeface and typography, color renderings, official uniform scripts, graphic designs, materials, workmanship, and quality. All Genuine CLC Products and designs are reviewed under these strict quality control procedures. All Genuine CLC Products must also be manufactured under certain standards of labor conditions.

**The Defendants**

13. Defendants are individuals and business entities of unknown makeup who own and/or operate one or more of the e-commerce stores under at least the Seller Aliases identified on Schedule A and/or other seller aliases not yet known to Plaintiff. On information and belief, Defendants reside and/or operate in the People's Republic of China or other foreign jurisdictions or redistribute products from the same or similar sources in those locations. Defendants have the capacity to be sued pursuant to Federal Rule of Civil Procedure 17(b).

14. On information and belief, Defendants, either individually or jointly, operate one or more e-commerce stores under the Seller Aliases listed in Schedule A attached hereto. Tactics used by Defendants to conceal their identities and the full scope of their operations make it virtually impossible for Plaintiff to learn Defendants' true identities and the exact interworking of their counterfeit network. If Defendants provide additional credible information regarding their identities, Plaintiff will take appropriate steps to amend the Complaint.

## IV. DEFENDANTS' UNLAWFUL CONDUCT

15. The fame of CLC Protected Trademarks and affiliated variety of licensed products, including apparel, hats, jewelry, toys, furniture, pennants, and bags, among others

7

(collectively, the "Genuine CLC Products"), has resulted in significant counterfeiting of CLC Protected Trademarks. In addition to other significant enforcement measures, CLC is a member of the Coalition to Advance the Protection of Sports Logos ("CAPS"), which is administered by Trademark Management LLC. CAPS has created an extensive anti-counterfeiting program, which includes regularly investigating suspicious e-commerce stores identified in proactive Internet sweeps and reported by a variety of informants in response to the significant counterfeiting of CLC Protected Trademarks. In recent years, CAPS, on behalf of its members, including CLC, has identified numerous fully interactive e-commerce stores on online marketplace platforms such as Amazon, eBay, AliExpress, Alibaba, Wish.com, Walmart, Etsy, Temu, and DHgate, including the e-commerce stores operating under the Seller Aliases. The Seller Aliases target consumers in this Judicial District and throughout the United States. According to a U.S. Customs and Border Protection (CBP) report, in 2021, CBP made over 27,000 seizures of goods with intellectual property rights (IPR) violations totaling over $3.3 billion, an increase of $2.0 billion from 2020. *Intellectual Property Rights Seizure Statistics, Fiscal Year 2021*, U.S. Customs and Border Protection (**Exhibit 2**). Of the 27,000 in total IPR seizures, over 24,000 came through international mail and express courier services (as opposed to containers), most of which originated from China and Hong Kong. *Id*.

16. Counterfeiters "routinely use false or inaccurate names and addresses when registering with these Internet platforms," that do not require sellers to verify their identities. **Exhibit 3**, Daniel C.K. Chow, *Alibaba, Amazon, and Counterfeiting in the Age of the Internet*, 40 Nw. J. Int'l L. & Bus. 157, 186 (2020); *see also* report on "Combating Trafficking in Counterfeit and Pirated Goods" prepared by the U.S. Department of Homeland Security's Office of Strategy, Policy, and Plans (Jan. 24, 2020), attached as **Exhibit 4** and finding that on "at least

8

some e-commerce platforms, little identifying information is necessary for a counterfeiter to begin selling" and recommending that "[s]ignificantly enhanced vetting of third-party sellers" is necessary. Counterfeiters hedge against the risk of being caught and having their websites taken down from an e-commerce platform by preemptively establishing multiple virtual store-fronts. **Exhibit 4** at p. 22. Since platforms generally do not require a seller on a third-party marketplace to identify the underlying business entity, counterfeiters can have many different profiles that can appear unrelated even though they are commonly owned and operated. **Exhibit 4** at p. 39. Further, "E-commerce platforms create bureaucratic or technical hurdles in helping brand owners to locate or identify sources of counterfeits and counterfeiters." **Exhibit 3** at 186-187.

17. Defendants have targeted sales to Illinois residents by setting up and operating e-commerce stores that target United States consumers using one or more Seller Aliases, offer shipping to the United States, including Illinois, accept payment in U.S. dollars and/or funds from U.S. bank accounts, and, on information and belief, have sold Counterfeit Products to residents of Illinois.

18. Defendants concurrently employ and benefit from substantially similar advertising and marketing strategies. For example, Defendants facilitate sales of Counterfeit Products by designing the e-commerce stores operating under the Seller Aliases so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers, including, in many instances, by copying the layouts, terms of service, legal notices and/or contact information found on the websites of Plaintiff's authorized online retailers. E-commerce stores operating under the Seller Aliases appear sophisticated and accept payment in U.S. dollars and/or funds from U.S. bank accounts via credit cards, Alipay, Amazon Pay, and/or PayPal. E-commerce stores operating under the Seller Aliases often include content and images that make it

very difficult for consumers to distinguish such stores from an authorized retailer. On information and belief, Plaintiff has not licensed or authorized Defendants to use any of the CLC Protected Trademarks, and none of the Defendants are authorized retailers of Genuine CLC Products.

19. Many Defendants also deceive unknowing consumers by using one or more CLC Protected Trademarks without authorization within the content, text, and/or meta-tags of their e-commerce stores to attract various search engines crawling the Internet looking for websites relevant to consumer searches for Genuine CLC Products. Other e-commerce stores operating under Seller Aliases omit using CLC Protected Trademarks in the item title to evade enforcement efforts while using strategic item titles and descriptions that will trigger their listings when consumers are searching for Genuine CLC Products. On information and belief, those Defendants that do not use CLC Protected Trademarks in searchable text do so in an effort to avoid detection of their Counterfeit Products.

20. E-commerce store operators like Defendants commonly engage in fraudulent conduct when registering the Seller Aliases by providing false, misleading and/or incomplete information to e-commerce platforms to prevent one from learning their true identities and the scope of their e-commerce operation.

21. E-commerce store operators like Defendants regularly register or acquire new seller aliases for the purpose of offering for sale and selling Counterfeit Products. Such seller alias registration patterns are one of many common tactics used by e-commerce store operators like Defendants to conceal their identities, the full scope and interworking of their counterfeiting operation, and to avoid being shut down.

22. Even though Defendants operate under multiple fictitious aliases, the e-commerce stores operating under the Seller Aliases often share unique identifiers, such as templates with common design elements that intentionally omit any contact information or other information for identifying Defendants or other Seller Aliases they operate or use. E-commerce stores operating under the Seller Aliases include other notable common features such as use of the same registration patterns, accepted payment methods, check-out methods, keywords, advertising tactics, similarities in price and quantities, the same incorrect grammar and misspellings, and/or the use of the same text and images. Additionally, Counterfeit Products for sale by the Seller Aliases bear similar irregularities and indicia of being counterfeit to one another, suggesting that the Counterfeit Products were manufactured by and come from a common source and that Defendants are interrelated.

23. E-commerce store operators like Defendants are in constant communication with each other and regularly participate in QQ.com chat rooms and through websites such as sellerdefense.cn and kuajingvs.com regarding tactics for operating multiple accounts, evading detection, pending litigation, and potential new lawsuits.

24. Counterfeiters such as Defendants typically operate under multiple seller aliases and payment accounts so that they can continue operation in spite of Plaintiff's enforcement. E-commerce store operators like Defendants maintain off-shore bank accounts and regularly move funds from their financial accounts to off-shore accounts outside the jurisdiction of this Court to avoid payment of any monetary judgment awarded to Plaintiff. Indeed, analysis of financial account transaction logs from previous similar cases indicates that off-shore counterfeiters regularly move funds from U.S.-based financial accounts to off-shore accounts outside the jurisdiction of this Court.

25. Defendants are working in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell Counterfeit Products in the same transaction, occurrence, or series of transactions or occurrences. Defendants, without any authorization or license from Plaintiff or the CLC University Clients, have jointly and severally, knowingly and willfully used and continue to use one or more CLC Protected Trademarks in connection with the advertisement, distribution, offering for sale, and/or sale of the Counterfeit Products into the United States and Illinois over the Internet.

26. Defendants' unauthorized use of one or more CLC Protected Trademarks in connection with the advertising, distribution, offering for sale, and sale of Counterfeit Products, including into the United States, including Illinois, is likely to cause and has caused confusion, mistake, and deception by and among consumers and is irreparably harming Plaintiff.

## COUNT I
## FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))

27. Plaintiff hereby re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs.

28. Defendants' promotion, marketing, offering for sale, and/or sale of the Counterfeit Products has created and is creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection, or association with Plaintiff and/or the CLC University Clients, or as to the origin, sponsorship, or approval of Defendants' Counterfeit Products by Plaintiff and the CLC University Clients.

29. By using one or more CLC Protected Trademarks on the Counterfeit Products, Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the Counterfeit Products.

30. Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the Counterfeit Products to the general public involves the use of counterfeit marks and is a willful violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

31. Plaintiff has no adequate remedy at law and, if Defendants' actions are not enjoined, Plaintiff will continue to suffer irreparable harm to its reputation and the goodwill of Plaintiff and its CLC Protected Trademarks.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1) That Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under or in active concert with them be temporarily, preliminarily and permanently enjoined and restrained from:

    a. using any CLC Protected Trademarks or any reproductions, counterfeit copies, or colorable imitations thereof in any manner in connection with the distribution, promotion, marketing, advertising, offering for sale, or sale of any product that is not a Genuine CLC Product or is not authorized by Plaintiff or the CLC University Clients to be sold in connection with CLC Protected Trademarks;

    b. passing off, inducing, or enabling others to sell or pass off any products as Genuine CLC Products or any other products produced by Plaintiff that are not Plaintiff's, or not produced under the authorization, control, or supervision of Plaintiff and approved by Plaintiff for sale under CLC Protected Trademarks;

    c. committing any acts calculated to cause consumers to believe that Defendants' Counterfeit Products are those sold under the authorization, control, or supervision of Plaintiff, or are sponsored by, approved by, or otherwise connected with Plaintiff;

     d. further infringing CLC Protected Trademarks and damaging Plaintiff's goodwill; and

     e. manufacturing, shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Plaintiff, nor authorized by Plaintiff to be sold or offered for sale, and which bear any trademarks protected by Plaintiff, including the CLC Protected Trademarks, or any reproductions, counterfeit copies, or colorable imitations thereof;

2) Entry of an Order that, at Plaintiff's choosing, the registrant of the Domain Names shall be changed from the current registrant to Plaintiff, and that the domain name registries for the Domain Names, including, but not limited to, VeriSign, Inc., Registry Services, LLC, Afilias Limited, CentralNic, Nominet, and the Public Interest Registry, shall unlock and change the registrar of record for the Domain Names to a registrar of Plaintiff's selection, and that the domain name registrars, including, but not limited to, GoDaddy.com, LLC, Name.com, PDR LTD. d/b/a PublicDomainRegistry.com, and Namecheap Inc., shall take any steps necessary to transfer the Domain Names to a registrar account of Plaintiff's selection; or that the same domain name registries shall disable the Domain Names and make them inactive and untransferable;

3) Entry of an Order that, upon Plaintiff's request, those with notice of the injunction, including, without limitation, any online marketplace platforms such as eBay, AliExpress, Alibaba, Amazon, Wish.com, Walmart, Etsy, Temu, and DHgate shall disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit and infringing goods using CLC Protected Trademarks;

4) That Defendants account for and pay to Plaintiff all profits realized by Defendants by reason of Defendants' unlawful acts herein alleged and that the amount of damages for infringement of CLC Protected Trademarks be increased by a sum not exceeding three times the amount thereof as provided by 15 U.S.C. § 1117;

5) In the alternative, that Plaintiff be awarded statutory damages for willful trademark counterfeiting pursuant to 15 U.S.C. § 1117(c)(2) of $2,000,000 for each and every use of CLC Protected Trademarks;

6) That Plaintiff be awarded its reasonable attorneys' fees and costs; and

7) Award any and all other relief that this Court deems just and proper.

Dated this 23rd day of July 2024.                Respectfully submitted,

/s/ Justin R. Gaudio
Amy C. Ziegler
Justin R. Gaudio
Allyson M. Martin
Rachel S. Miller
Greer, Burns & Crain, Ltd.
300 South Wacker Drive, Suite 2500
Chicago, Illinois 60606
312.360.0080
312.360.9315 (facsimile)
aziegler@gbc.law
jgaudio@gbc.law
amartin@gbc.law
rmiller@gbc.law

*Attorneys for Plaintiff Collegiate Licensing Company, LLC*